**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-00858-REB

WILDEARTH GUARDIANS,

      Petitioner.

vs.

TAMARA CONNER, in her official capacity as District Ranger, Leadville Ranger District, San Isabel National Forest, United States Forest Service, and

UNITED STATES FOREST SERVICE, a federal agency of the United States Department of Agriculture,

      Federal Respondents.

---

**PETITIONER'S OPENING MERITS BRIEF**

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ i

INTRODUCTION .......................................................................................................... 1

JURISDICTION AND STANDING ................................................................................. 1

STANDARD OF REVIEW.............................................................................................. 4

BACKGROUND............................................................................................................ 5

    I.     The National Environmental Policy Act ............................................................. 5

    II.    Canada lynx (*lynx Canadensis*) ....................................................................... 6

    III.   The Project. ...................................................................................................... 8

ARGUMENT ............................................................................................................... 12

    I.     The Forest Service failed to disclose and analyze the Project's Impacts. ..... 12

          a.     The EA lacks required site-specific detail........................................... 15

          b.     The EA fails to disclose critical information about lynx denning habitat. . ............................................................................................................. 18

          c.     The EA fails to disclose critical information about lynx winter habitat. .... ............................................................................................................. 20

    II.    The Forest Service failed to prepare an Environmental Impact Statement....21

          a.     The Project contemplates significant direct and cumulative impacts. ..... ............................................................................................................. 23

          b.     The project would be implemented in areas with unique characteristics. ............................................................................................................. 24

          c.     The Projects' effects are highly uncertain and highly controversial.....25

          d.     The project contemplates significant effects to species listed as threatened under the Endangered Species Act. .................................27

    III.   The Forest Service failed to consider a reasonable range of alternatives. ....27

CONCLUSION..................................................................................................... 30

CERTIFICATE OF SERVICE ............................................................................... 32

## TABLE OF AUTHORITIES

**Cases:**

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723 (9th Cir. 1995) ..................................................................................................................... 28

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87 (1983) ............... 12, 21

*Biodiversity Cons. Alliance v. Jiron*, 762 F.3d 1036 (10th Cir. 2014) ...................... 12, 13

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ........... ..................................................................................................................... 21, 22

*Calvert Cliffs Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971) ................................................................................................ 6

*Cascadia Wildlands v. Forest Service*, 937 F. Supp. 2d 1271 (D. Or. 2013) ................. 22

*Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169 (10th Cir. 2008) ....... 6

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ........................... 4

*Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162 (10th Cir. 1999) ...................................... 5

*Colo. Envtl. Coal. v. Ofc. of Legacy Mgmt.*, 819  F. Supp. 2d 1193 (D. Colo. 2011).......... ..................................................................................................................... 12, 13, 15

*Colo. Envtl. Coal. v. Salazar*, 875 F. Supp. 2d 1233 (D. Colo. 2012).............................. 12

*Comm. to Save Rio Hondo v. Lucero*, 102 F.3d 445 (10th Cir. 1996)......................... 2, 3

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir. 2008).................................................................................................................. 28

*Custer County Action Ass'n v. Garvey*, 256 F.3d 1024 (10th Cir. 2001) ......................... 5

*Dine Citizens Against Ruining our Env't v. Klein*, 747 F. Supp. 2d 1234 (D. Colo. 2010).. .............................................................................................................. 5, 22, 27, 28, 30

*Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257 (10th Cir. 2004)........................ 27

*Hunt v. Wash. State Apple Advertising Comm'n*, 423 U.S. 333 (1977)............................ 2

*Klamath-Sikiyou Wildlands Ctr. v. Bur. of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004) ...14

*Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220 (10th Cir. 2002) ........25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)...........4

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999)...............29

*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005) ..........25

*New Mexico ex rel Richardson v. Bur. of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009) ......
................................................................................................................................12, 13

*Ocean Advocates v. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2004)...............18

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994) ...........................4

*Ore. Nat. Desert Ass'n v. Bur. of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010).................6

*Ore. Natural Res. Council Fund v. Brong*, 492 F.3d 1120 (9th Cir. 2007).....................14

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ...............................5

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ...................................................................4

*Town of Superior v. U.S. Fish and Wildlife Serv.*, 913 F. Supp. 2d 1087 (D. Colo. 2012) .
................................................................................................................................18, 25

*W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013) ...........................28, 29

*WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178 (10th Cir. 2013) ......................4

*Wyoming v. U.S. Dept. Agric.*, 661 F.3d 1209 (10th Cir. 2011)......................................13

**Statutes:**

5 U.S.C. § 701 ...................................................................................................................1

5 U.S.C. § 706 ...............................................................................................1, 4, 23, 30

28 U.S.C. § 1331 ...............................................................................................................1

28 U.S.C. § 1391 ...............................................................................................................1

28 U.S.C. § 2201 ........................................................................................................... 1

28 U.S.C. § 2202 ........................................................................................................... 1

42 U.S.C. § 4321 ........................................................................................................... 1

42 U.S.C. § 4332 .................................................................................................... 21, 28

**Regulations:**

36 C.F.R. § 220.7 ........................................................................................................ 30

40 C.F.R. § 1500.1 ................................................................................................... 5, 6

40 C.F.R. § 1502.14 ....................................................................................... 27, 28, 30

40 C.F.R. § 1502.16 .................................................................................................... 13

40 C.F.R. § 1508.7 ...................................................................................................... 14

40 C.F.R. § 1508.8 ...................................................................................................... 13

40 C.F.R. § 1508.9 ...................................................................................................... 28

40 C.F.R. § 1508.25 .................................................................................................... 13

40 C.F.R. § 1508.27 ................................................................... 13, 22, 23, 24, 25, 27

**Other authority:**

65 Fed. Reg. 16052 (March 24, 2000) ......................................................................... 8

Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act
Regulations, 46 Fed. Reg. 18026, 18027 (March 23, 1981) .......................................... 29

**INTRODUCTION**

Petitioner WildEarth Guardians hereby respectfully files this opening brief in support of its Petition for Review [#1] of federal agency action. Guardians respectfully requests that the Court declare that Federal Respondents Tamara Conner and United States Forest Service (collectively "Forest Service") violated the National Environmental Policy Act ("NEPA"), its implementing regulations, and the Administrative Procedure Act ("APA") in analyzing and authorizing the Tennessee Creek Project ("Project") via an Environmental Assessment ("EA") and Decision Notice and Finding of No Significant Impact ("DN/FONSI"). Guardians further respectfully requests that the Court vacate the EA and DN/FONSI, and enjoin the Forest Service from implementing the Project until the agency demonstrates to this Court it has complied with the law.

Pursuant to D.C.COLO.LCivR 7.1(a), the parties have conferred several times by phone and email regarding the claims in this case, but have been unable to resolve their differences.

**JURISDICTION AND STANDING**

Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question) and § 2202 (declaratory relief). This cause of action arises under the laws of the United States, including the APA, 5 U.S.C. § 701 et seq., and NEPA, 42 U.S.C. § 4321 et seq. An actual, justiciable controversy exists between Guardians and the Forest Service. The requested relief is proper under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. § 706. Venue is proper in this Court under 28 U.S.C. § 1391(e), because Respondents reside in this judicial district, and a substantial part of the events or omissions giving rise

to this litigation occurred in Colorado. Guardians submitted timely comments on and objected to the Project EA. Administrative Record T10149-62; AR T10746-10808.[1]

Guardians has standing to challenge the Project EA and DN/FONSI. To establish Article III standing, Guardians must show three things: (1) that its members have suffered "'injury in fact'–an invasion of a legally protected interest which is 'concrete and particularized' and 'actual or imminent'"; (2) a "causal connection … exist[s] between the injury and the conduct complained of"; and (3) that it is "likely that the injury will be redressed by a favorable decision." *Comm. to Save Rio Hondo v. Lucero*, 102 F.3d 445, 447 (10th Cir. 1996) (internal citations omitted).

An organizational plaintiff has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advertising Comm'n*, 423 U.S. 333, 343 (1977).

In NEPA cases, a plaintiff satisfies the injury in fact requirement by showing (1) the alleged NEPA violation creates an increased risk of environmental harm and that such increased risk is to the plaintiff's concrete interests; and (2) the plaintiff has a geographical nexus to or actual use of the area of the agency action. *Comm. to Save Rio Hondo*, 102 F.3d at 449. "To establish causation, a plaintiff need only show its increased risk is fairly traceable to the agency's failure to comply with [NEPA]." *Id.* at 451. Redressability exists if "it is likely … that the injury will be redressed by a favorable

---

[1] Documents in the Administrative Record [#15] and Supplemental Administrative Record [#22] are cited to as AR ***.

decision." *Id*. 452. Importantly, "a plaintiff need not establish that the ultimate agency decision would change upon [NEPA] compliance." *Id*.

In addition to Article III standing, a plaintiff must also establish that "it is 'adversely affected or aggrieved … within the meaning of a relevant statute' by some final agency action." *Id*. at 448 (internal citation omitted). In NEPA cases, a plaintiff "seek[ing] to protect its recreational, aesthetic, and consumptive interests in the land and water" has suffered injuries that "fall within the 'zone of interests' that [NEPA] was designed to protect." *Id*. (internal citation omitted).

Here, Guardians meets these standards. Guardians' members are directly harmed by the Forest Service's violations of NEPA, and the Project would negatively impact numerous interests Guardians' members have in the project area. *See* Declaration of Kevin Mueller at 3-24 ¶¶ 8-14. The Forest Service's failure to conduct a lawful and complete NEPA analyses created an increased risk of environmental harm through uninformed decision-making, and this harm would be redressed by a decision requiring the Forest Service to comply with NEPA. Further, Guardians' members regularly use the project area for recreational, aesthetic, scientific, and spiritual purposes, and have plans to do so in the future. *Id*. These interests in the project area fall within the "zone of interests" that NEPA was designed to protect. *See Comm. to Save Rio Hondo*, 102 F.3d at 448. Finally, Guardians can pursue this case on behalf of its members because its members have standing, the claims are germane to its organizational purposes, and individual members are not required to participate. *See* Mueller Dec. at 1-3 ¶¶ 3-5; *see also Comm. to Save Rio Hondo*, 102 F.3d at 447 n. 3.

**STANDARD OF REVIEW**

The APA governs judicial review of agency action under NEPA. 5 U.S.C. § 706.

Under the APA, "[t]he reviewing court shall … hold unlawful and set aside agency

action, findings, and conclusions found to be arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *WildEarth*

*Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1182-83 (10th Cir. 2013). This review

requires a court to "determine whether the agency considered all relevant factors and

whether there has been a clear error of judgment." *Olenhouse v. Commodity Credit*

*Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994). Accordingly, agency action will be set aside

if

> the agency has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the problem,
> offered an explanation that runs counter to the evidence before the
> agency, or is so implausible that it could not be ascribed to a difference in
> view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A

reviewing court may not "supply a reasoned basis for the agency's action that the

agency itself has not given." *Id*. (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196

(1947)). Instead, "[a]n agency's action must be upheld, if at all, on the basis articulated

by the agency itself." *Id*. at 50. The arbitrary and capricious standard is deferential, but it

does not "shield" agency decisions from a "searching and careful," "thorough, probing,

and in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402,

415, (1971).

**BACKGROUND**

**I.     The National Environmental Policy Act.**

NEPA "is our basic national charter for protection of the environment." 40 C.F.R.

§ 1500.1(a). NEPA "'prescribes the necessary process' by which agencies must take a

'hard look at the environmental consequences of proposed actions utilizing public

comment and the best available scientific information;' it 'does not mandate particular

results.'" *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1034 (10th Cir. 2001)

(quoting *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1171-72 (10th Cir. 1999)).

While "[o]ther statutes may impose substantive environmental obligations on federal

agencies … NEPA merely prohibits uninformed–rather than unwise–agency action."

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989). However,

"focusing the agency's attention on the environmental consequences of a proposed

project … ensures that important effects will not be overlooked or underestimated only

to be discovered after resources have been committed or the otherwise

cast….Moreover, the strong precatory language of § 101 of [NEPA] and the requirement

that agencies prepare detailed impact statements inevitably bring pressure to bear on

agencies 'to respond to the needs of environmental quality.'" *Id*. (citing 115 Cong. Rec.

40425 (1969) (remarks of Sen. Muskie)).

NEPA's "procedural requirements are not merely formalities." *Dine Citizens*

*Against Ruining our Env't v. Klein*, 747 F. Supp. 2d 1234, 1248 (D. Colo. 2010) ("*Dine*

*CARE*"). "NEPA procedures must insure that environmental information is available to

public officials and citizens before decisions are made and before actions are taken." 40

C.F.R. § 1500.1(b).

> [B]y requiring agencies to take a 'hard look' at how the choices before
> them affect the environment, and then to place their data and conclusions
> before the public, NEPA relies upon democratic processes to ensure–as
> the first appellate court to the construe the statute in detail put it–that the
> 'most intelligent, optimally beneficial decision will ultimately be made.'

*Ore. Nat. Desert Ass'n v. Bur. of Land Mgmt.*, 625 F.3d 1092, 1099-1100 (9th Cir. 2010)

(quoting *Calvert Cliffs Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449

F.2d 1109, 1114 (D.C. Cir. 1971) (citation omitted)).

"NEPA places upon federal agencies the obligation to consider every significant

aspect of the environmental impact of a proposed action. It also ensures that an agency

will inform the public that it has considered environmental concerns in its decision-

making process." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169,

1177-78 (10th Cir. 2008) (internal quotation and citations omitted). "Public scrutiny [is]

essential to implementing NEPA." 40 C.F.R. § 1500.1(b). "Ultimately, of course, it is not

better documents but better decisions that count. NEPA's purpose is not to generate

paperwork–even excellent paperwork–but to foster excellent action." 40 C.F.R. §

1500.1(c).

## II.     Canada lynx (*lynx Canadensis*).

The Canada lynx (lynx) is medium-sized cat with long legs, large paws adapted

to walking on snow, long tufts on the ears, and a short, black-tipped tail. AR T06830.

Lynx reside in boreal forests extending from the arctic tundra in Alaska and Canada to

subalpine forests in the western United States. AR T06846. Lynx habitat includes

"gentle, rolling topography" with "dense horizontal cover, persistent snow, and moderate to high snowshoe hare densities." AR T06848. Lynx prefer boreal forests with "Engelmann spruce, subalpine fire, and lodgepole pine forest cover types occurring on cold, moist potential vegetation types." AR T06849. Lynx in Colorado tend to occupy higher elevations than elsewhere in the United States. AR T06849. In Colorado, lynx home ranges average 40 square miles for males, and 29 square miles for females. AR T06848.

Lynx predominantly feed on snowshoe hare, and therefore their habitat is closely correlated with snowshoe hare habitat. AR T06833. In Colorado, however, snowshoe hare represent approximately 66% of kills by lynx, with more than 22% of kills being red squirrels. AR T06842. Lynx foraging habitat includes "conifer and conifer hardwood habitats that support their primary prey of snowshoe hares." AR T06851. "Dense saplings or mature multi-layered stands are the conditions that maximize the availability of food and cover for snowshoe hares at varying snow depths throughout the winter." *Id*. However, the best available science indicates that lynx winter habitat "may be more limiting for lynx." *Id*. In winter, lynx do not hunt areas with openings–such as areas that have been clear cut or thinned excessively. AR T06852.

Lynx denning habitat is important to lynx as natal and maternal dens are used to raise kittens for the first 6-8 weeks of their life. AR T06853. To be functional, lynx denning habitat must be in or adjacent to lynx foraging habitat. *Id*. Lynx denning habitat requires coarse woody debris, which "provides kittens with protection from extreme temperatures, precipitation, or predators." *Id*. "The common components of lynx denning

habitat are large woody debris–including down logs and root wads–and dense

horizontal cover. *Id*.

Lynx were listed as threatened under the Endangered Species Act by the U.S.

Fish and Wildlife Service in 2000. 65 Fed. Reg. 16052 (March 24, 2000). Several

factors contributed to lynx listing, including "human alteration of the distribution and

abundance, species composition, successional stages, and connectivity of forests, and

the resulting changes in the forest's capacity to sustain lynx populations." *Id*. at 16080.

Lynx are known to occupy the Project area, as numerous lynx observations have

been reported in recent years. AR T06534. Additionally, three lynx were recently

trapped, collared, and released by Forest Service researchers in or near the Project

area. *Id*. However, sufficient lynx surveys in and near the Project area have not been

completed, so the Forest Service does not know specifically how many lynx reside in or

near the Project area. *Id*.

**III.    The Project.**

The Project is located on the Leadville Ranger District of the San Isabel National

Forest and the Eagle-Holy Cross Ranger District of the White River National Forest in

Colorado. AR T10712. The Project includes logging, road construction, and other

activities on up to 16,450 acres of National Forest land, including 2,370 acres of clear

cutting and 6,765 acres of thinning in four implementation areas: Halfmoon Creek, Mt.

Zion, Turquoise Lake, and Tennessee Pass. AR T10713; AR T10510. The Holy Cross

and Mt. Massive wildernesses are both located immediately adjacent to the project

area. AR T10561. The Continental Divide National Scenic Trail and Colorado Trail both

bisect the project area. AR T10560. The Project would negatively impact these wilderness areas and trails, because logging units would be visible from them, noise from logging trucks would be heard from them, and overall there would be a "reduction in the quality of the visitors' experience." AR T10561. Additionally, the Project would impact six 10th Mountain Division huts and those who recreate in and around them. AR T02366-68. "[T]he Project area is both an ecologically and recreationally treasured part of the San Isabel National Forest." AR T02389.

The Project area provides important habitat for lynx, wolverine, and Rocky Mountain elk. AR T10567; AR T10571. The Project area is occupied by lynx, wolverine, and Rocky Mountain elk. AR T 06534; AR T10571. The treatment areas include portions of two Lynx Analysis Units ("LAUs")[2]: the Massive LAU and the Tennessee Pass LAU. AR T10508. The Project would log in a total of 9,480 acres within these LAUs. *Id*. The EA estimates that, as a result of the Project, approximately 3,650 acres of lynx habitat will be converted to unsuitable habitat. AR T10576. The Project area is mostly located within the Tennessee Pass linkage area, which provides important movement corridors and habitat connectivity for lynx populations. AR T10568; AR T06561 ("The Tennessee Pass linkage area was designated because it 'provides major connections between blocks of habitat.'"). The Project would impact the Tennessee Pass Linkage Area as both logging and road construction will occur within its

---

[2] Lynx Analysis Units "are a tool to guide management that will support a reproductive population of lynx in core areas." AR T06910. "They do not depict actual lynx home ranges, but should approximate the size of a female's home range and contain year-round habitat components." *Id*. "Maintaining good quality and distribution of denning and foraging resources within a LAU will help to assure survival and reproduction by adult females, which is critical to sustain the overall lynx population." AR T06911.

boundaries. AR T06548.

The Project would remove or degrade considerable amounts of lynx denning habitat throughout the Project area for more than 150 years, resulting in fewer denning opportunities for lynx and less habitat structure for its prey. AR T10577; AR T06492. The Project was designed knowing that its design features would not leave sufficient woody debris on the landscape to create sufficient quality lynx denning habitat, even after 150 years. AR T06493. Importantly, because the Forest Service did not disclose the location or size of logging units or temporary roads, the actual anticipated impacts to lynx and lynx habitat are unknown.

To comply with NEPA, the Forest Service initiated a scoping process in November 2012, AR T02320, and released a draft EA in December 2013, AR T09580. Guardians submitted timely comments on the draft EA that challenged certain aspects of the project, requested additional information, and expressed support for certain aspects of the project. AR T10149-62. The Forest Service released a final EA and draft DN/FONSI proposing to adopt Alternative 1 in April 2014. AR T10488. Guardians filed timely objections to the final EA and draft DN/FONSI in June 2014, again reiterating its opposition to certain aspects of the project, requesting additional information, expressing support for certain aspects of the project, and providing the Forest Service with additional scientific information. AR T10746-10808.

In an attempt to resolve Guardians' objections, Guardians and the Forest Service met by phone twice in July 2014. AR T10821-23. During these meetings, the Forest Service disclosed it had revised the Project's Biological Assessment ("BA") without

disclosing the updated document to Guardians or to the general public. AR T10824.

Even though the revised BA was prepared in March 2014, the final EA and draft

DN/FONSI made no mention of a revised BA, and it was not provided to Guardians until

after the period in which to submit objections had lapsed. *Id*. Guardians was "surprised

to hear that a revised BA was prepared and submitted in March 2014, as the final EA

and draft DN/FONSI released in April 2014 made no mention of a revised BA." *Id*.

Guardians

> would have greatly appreciated being notified of the revised BA at the time
> it was submitted to USFWS, especially in light of our extensive comments
> and objections related to lynx in the project area. At a minimum, this
> should have been disclosed in the Final EA and/or draft DN/FONSI. By not
> publicly disclosing that this took place, we were put into a position where
> we had to object to the project with incomplete information, and an
> outdated BA. It is quite possible that this could have altered what aspects
> of the project that we objected to. Especially considering that much of the
> lynx analysis in the final EA references additional information found in the
> BA, this should have been disclosed to the public.

*Id*.

Ultimately, the Forest Service was unwilling to make any changes to the Project

in response to Guardians' objections, and only offered to allow it to "participate in the

implementation phase of this project and encourage you to assist us with applying

design criteria to unit layout and monitoring." AR T11029. This, however, did not

assuage Guardians' legitimate concerns:

> [T]he fact that there are so many unknowns about the project, including
> where specifically the treatments will take place and what the actual on
> the ground condition of those units is makes us question whether this
> project is truly ready to be authorized. Absent this additional information
> about what specific units will be logged and present condition of those
> units, we can only offer to withdraw our objection if the Forest Service
> would commit to not log in the mapped lynx habitat identified in the

Biological Assessment.

AR T11031. The Forest Service responded to Guardians' objections in July 2014, and found the objections lack merit and the DN/FONSI could be issued. AR T11033-45. The Forest Service issued the DN/FONSI in November 2014. AR T10711-41.

## ARGUMENT

**I.      The Forest Service failed to disclose and analyze the Project's impacts.**

NEPA imposes an obligation on the Forest Service to disclose and analyze environmental information and consequences of federal action. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983) (agency must take "hard look" at environmental consequences before taking action). "The purpose of the 'hard look' requirement is to ensure that the 'agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.'" *Colo. Envtl. Coal. v. Salazar*, 875 F. Supp. 2d 1233, 1250 (D. Colo. 2012) (citing *Baltimore Gas & Elec. Co.*, 462 U.S. at 97).

Federal "[a]gencies must 'take a hard look at the environmental consequences of proposed actions utilizing public comment and the best available scientific information.'" *Biodiversity Cons. Alliance v. Jiron*, 762 F.3d 1036, 1086 (10th Cir. 2014) (internal citation omitted). This hard look "assessment of all 'reasonably foreseeable' impacts must occur at the earliest practicable point, and must take place before an 'irretrievable commitment of resources' is made." *Colo. Envtl. Coal. v. Ofc. of Legacy Mgmt.*, 819  F. Supp. 2d 1193, 1208 (D. Colo. 2011) (citing *New Mexico ex rel Richardson v. Bur. of Land Mgmt.*, 565 F.3d 683, 718 (10th Cir. 2009) reconsid. granted in part on other

grounds, 2012 WL 628547 (D. Colo. Feb. 27, 2012). "An agency meets the 'hard look'
requirement when it has 'made a reasoned evaluation of the available information and
its method was not arbitrary or capricious.'" *Jiron*, 762 F.3d at 1086 (internal citation
omitted).

Additionally, NEPA requires that this hard look assessment take place at the site-
specific level if there are no additional NEPA processes yet to occur in the future to fully
implement the project and the environmental impacts are reasonably foreseeable. *See
New Mexico ex rel Richardson*, 565 F.3d at 718-19 (requiring site-specific NEPA
analysis when no future NEPA process would occur); *Ofc. of Legacy Mgmt.*, 819  F.
Supp. 2d at 1209-1210 (requiring site-specific NEPA analysis even when future NEPA
would occur because "environmental impacts were reasonably foreseeable"); *cf.
Wyoming v. U.S. Dept. Agric.*, 661 F.3d 1209, 1256 (10th Cir. 2011) (not requiring site-
specific NEPA analysis because decision was "a 'broad' nationwide rule" allowing
Forest Service to evaluate effects "generically").

Specifically, NEPA requires the Forest Service to disclose and analyze the direct,
indirect, and cumulative impacts and consequences of its activities. 40 C.F.R. §§
1502.16(a), 1502.16(b), 1508.25(c), 1508.27(b)(7). Direct effects include that "which are
caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a).
Indirect effects are those "which are caused by the action and are later in time or farther
removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b).
Cumulative impacts include "impact on the environment which results from the
incremental impact of the action when added other past, present, and reasonably

foreseeable future actions regardless of what agency (Federal or non-federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. Importantly, "[c]umulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id*.

There are "two critical features of a cumulative effects analysis[:] … [f]irst, it must not only describe related projects but also enumerate the environmental effects of those projects … Second, it must consider the interaction of multiple activities and cannot focus exclusively on the environmental impacts of an individual project." *Ore. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1133 (9th Cir. 2007). "A proper consideration of the cumulative impacts of a project requires 'some quantified or detailed information; … [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided.'" *Klamath-Sikiyou Wildlands Ctr. v. Bur. of Land Mgmt.*, 387 F.3d 989, 993-94 (9th Cir. 2004) (internal citation omitted). Importantly, "generalized conclusory statements that the effects are not significant or will be effectively mitigated" render a cumulative effects analysis inadequate. *Id*. at 996.

Here, the Tennessee Creek project EA and DN/FONSI fail to disclose, analyze, and otherwise take a hard look at several categories of environmental effects–including on lynx and specific types of lynx habitat–which makes accurate assessment of the environmental consequences of the proposed action impossible.[3]

---

[3] The Forest Service is clear that all necessary disclosure and analysis of environmental consequences and effects is contained within the EA. AR T10813 ("All effects analysis is in the Final EA (pgs. 80-93).").

a.    The EA lacks required site-specific detail.

A principle reason the Forest Service failed to take a hard look at such an extensive array of effects is the process by which it prepared the EA and DN/FONSI. The EA fails to disclose any location of any specific logging units within the project area, nor does it disclose the size of those logging units. AR T10575 ("[I]mplementation locations are not being pre-determined and therefore, it cannot be determine [sic] how many acres of lynx habitat would actually be affected.").  Nor does the EA identify precisely what types of logging or other treatments will be employed in each logging unit. The EA also fails to disclose the locations of approximately 21 miles of temporary roads that will be constructed to fully implement the project. AR T10579 ("The assumption is that all roads would be constructed in lynx habitat[,] since the locations are not predetermined."). This approach runs counter to that contemplated by the District Ranger who initiated the Project, and stated: "I do not want decisions made until ALL field data collection has been completed." AR T02461 (emphasis original).

Because the Forest Service failed to identify where specifically in the Project area it would log, how it would log those specific logging units, and where it would build roads, the EA does not perform the site-specific analysis that NEPA requires. *See Ofc. of Legacy Mgmt.*, 819  F. Supp. 2d at 1209-1210. An example of why this approach is problematic is the agency's promise to create "reserves" within the Project area to preserve "[a]reas of high biodiversity currently on the landscape," AR T10575, and to serve "as refuge for wildlife species," AR T10507. But the EA similarly fails to discuss where any such areas would be located, and their size–both individually and

cumulatively–as well as whether these areas would include any lynx habitat, lynx denning habitat, or lynx linkage areas.

Similarly, because no locations or sizes of logging units or temporary road sites are identified, the public and the decision-maker are improperly left to guess as to how the Forest Service will actually implement the Project across 16,450 acres that includes lynx habitat. AR T10575. The public and decision-maker are left to guess where the 2,485 acres of clear cuts, 7,110 acres of thinning, and approximately 21 miles of temporary roads will be located within the project area. *See* AR T10575; AR T10579. The Forest Service repeatedly asserts it assumed that "all treated acres within this proposal are lynx habitat," AR T10575; AR T06490; AR T06583; AR T10579,[4] but that is insufficient to excuse the Forest Service's NEPA obligation to take a hard look–at the site-specific level–of the environmental consequences of its proposed action.

A second example of the problem with the Forest Service's approach is the method by which it states it will preserve and protect important lynx habitat. The EA asserts that in "mapped lynx habitat, stands with greater than 35 percent dense horizontal cover" would not be logged, AR T10507, but the EA fails to provide relevant information to enable the public and the decision-maker to ground-truth this statement. Indeed, the EA does not state how much lynx habitat meets this definition, where it is located within the project area, or where it is located in relation to other such habitat in

---

[4] The Forest Service explains its assumption differently in the EA. First, the Forest Service asserts it "assume[s] that all treated acres within this proposal are lynx habitat." AR T10575; *see also* AR T06490. But later in the same paragraph, it states that it "assumes … that all 9,480 acres of lynx habitat out of the total 13,580 treatable acres within the project would be treated." AR T10575; *see also* AR T06490. The EA does not reconcile these conflicting statements.

the vicinity. This is exactly the type of information that must be disclosed in an EA,

before a final decision to authorize such a massive project. Indeed, the Forest Service

specifically explained that it was critical to determine what parts of the project area in

fact contain more than 35 percent dense horizontal cover:

> This is very important!! Will these areas be identified on the ground and
> excluded? How? Who? When? By a biologist who knows what to look for
> from a lynx perspective or a forester? Others can do it if properly trained
> like during stand exams or during the silvicultural Rx. This is essential that
> this happens since a lot is riding on the proper implementation of this. You
> are basing your analysis that this will be done and done correctly the way
> you intend.

AR T11860. Given the importance of these determinations, the Forest Service should

have disclosed what areas of the Forest met this standard.

Interestingly, despite the fact that the EA does not specify where any logging

units will be located, their size, or the prescriptions that will be used in each, the record

reveals that while *most* logging units had not been identified, the Forest Service had

already "pre-identified" logging units for pre-commercial thinning. AR T11614. The

Forest Service, however, does not reveal where these "pre-identified" logging units are

located or their size, nor does it explain why it did not disclose the locations and sizes of

these logging units to the public during the NEPA process.

It is important to note that the Forest Service has no plans to conduct additional

NEPA analysis to consider site-specific impacts of the Project. By failing to specifically

designate logging units and disclose to the public where exactly logging would occur,

and what types of logging prescriptions would occur in each location, the Forest Service

deprived the public and the decision-maker with the ability to assess the actual on-the-

ground impacts of the Project. This led to extensive deficiencies in the NEPA analysis, thereby rendering the EA and DN/FONSI arbitrary and capricious.

Moreover, even if this Court were to hold that the Forest Service need not determine locations and sizes of the logging units, or where temporary roads would be constructed, at a minimum the Forest Service has a duty to quantify the anticipated scope of its effects. *Town of Superior v. U.S. Fish and Wildlife Serv.*, 913 F. Supp. 2d 1087, 1120 (D. Colo. 2012) ("[A]gencies must offer some 'quantified' or otherwise detailed information; 'general statements about 'possible' effects and 'some risk' do not constitute a hard look absent a justification regarding why more definitive information could not be provided.'") (internal citation omitted); *see also Ocean Advocates v. Army Corps of Engineers*, 402 F.3d 846, 868 (9th Cir. 2004). Here, the Forest Service refused to quantify the amount of lynx winter habitat and lynx denning habitat that existed in the project area at the time the EA was prepared; how much of each habitat type would be logged or degraded as a result of the implementation of the project; how much of each habitat type would remain in the project area after the project is fully implemented; and the location of such habitat types in relation to other types of lynx habitat, including lynx foraging habitat and lynx linkage areas.

      b.    <u>The EA fails to disclose critical information about lynx denning habitat.</u>

In its comments on the draft EA and in its objections, Guardians repeatedly expressed its concerns about the effects of the Project on lynx and specific types of lynx habitat within the project area. *See* AR T10151-61; AR T10749-55; AR T10758-63. Because the Project contemplates the loss or degradation of lynx denning habitat for

more than 150 years, AR T10577, Guardians specifically asked the Forest Service to "disclose and analyze how much denning habitat would be removed by the project, how much denning habitat will remain under the selected alternative, and whether the remaining habitat is near suitable lynx foraging habitat." AR T10752. Absent this information, the public and the decision-maker had no means by which to analyze the significance of lost or degraded lynx denning habitat in the project area for more than 150 years.

This information is important for several reasons. First, degraded lynx denning habitat not only impacts where lynx den, it also impacts habitat requirements for lynx prey. AR T06492 ("The proposed harvesting treatments would likely result in less woody debris being available on the forest floor for both lynx denning opportunities and less structure for lynx prey."). Second, the effects of degrading a single acre of lynx denning habitat is vastly different from the effects of degrading 13,580 acres of lynx denning habitat. Third, there is doubt as to whether lynx denning habitat would ever recover, even after 150 years, as the Forest Service admits: "Even though a design criterion … requires appropriate amounts of downed logs or piles to remain on the landscape, it would not likely be enough to be considered quality denning habitat." AR T06493.

The question is not whether the Forest Service conducted this analysis, given that it admits it "[d]id not differentiate in analysis between denning, foraging, etc." habitat for lynx in the project area. AR T11613. Rather, the question is whether the Forest Service had a duty to conduct this analysis and provide the results to the public and the decision-maker. The Leadville Ranger District's Wildlife Biologist stated she could do

the analysis, but asked whether it was required. AR T11613 ("I CAN do this analysis, but will be lengthy – is it required????") (emphasis original). The final "Consideration of Comments" document, however, contradicts the Wildlife Biologist: "denning [habitat] is not specifically mapped out (and therefore cannot be quantified by acres)." AR T10266. Neither the EA nor the record explains this disconnect.

Further, the Forest Service's Rocky Mountain Regional Program Leader for Threatened, Endangered, and Sensitive Species stressed that this analysis is important: "Having some idea of the availability of denning and foraging habitats is still important to understanding whether the delineation (share, size, location) makes sense and the life requisite objectives of these [Lynx Analysis Units] are being met." AR T11593. This same individual later commented to the Leadville Ranger District's Wildlife Biologist: "I suppose you do need some finer level understanding of the habitat conditions pre- and post-project in that project area to know how you align with the [Southern Rockies Lynx Amendment] guidelines you mentioned." AR T11591. In other words, the Forest Service cannot properly evaluate the environmental consequences of the Project without first analyzing how much lynx denning habitat existed within the Project area prior to implementation and how much would be degraded as a result of the Project. This analysis must also extend to the cumulative impacts of other activities on lynx denning habitat within the cumulative effects planning area.

c.    The EA fails to disclose critical information about lynx winter habitat.

Additionally, the Forest Service failed to disclose the effects of the Project on lynx winter habitat. Guardians specifically asked the Forest Service to "not confuse

[snowshoe hare habitat and lynx winter habitat] and analyze and disclose the effects of the Tennessee Creek project on lynx winter habitat, as well as any effects on snowshoe hare, recognizing that they are not the same thing." AR T10751. In response, the Forest Service acknowledged that snowshoe hare habitat and lynx winter habitat are not the same thing, but ultimately refused to provide any additional detail about lynx winter habitat within the Project area. AR T10264. The Forest Service summarily asserts that design features of the project would protect lynx winter habitat, AR T10264, but that assertion cannot be confirmed, and does not alter the Forest Service's duty to disclose, analyze, and otherwise take a hard look at the environmental effects of its proposed actions. *Baltimore Gas & Elec. Co.*, 462 U.S. at 97.

As with the effects to lynx denning habitat, the EA does not disclose how much lynx winter habitat exists in the project area, and how much would remain after the Project is implemented. It also does not disclose other cumulative impacts to lynx winter habitat. Absent such information, the EA and DN/FONSI are arbitrary and capricious.

## II.    The Forest Service failed to prepare an Environmental Impact Statement.

NEPA requires the Forest Service to prepare an EIS when it proposes a major federal action that may significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) ("[A] 'plaintiff need not show that significant effects will in fact occur….' It is enough for the plaintiff to raise 'substantial questions whether a project may have a significant effect' on the environment.") (internal citation omitted). If a plaintiff raises substantial questions regarding whether a project may have a significant effect on the

environment, "a decision not to prepare an EIS is unreasonable." *Blue Mountains Biodiversity Project*, 161 F.3d at 1211 (internal citation omitted).

In making the determination as to whether or not to prepare an EIS, the Forest Service "must consider both the context and the intensity of the proposed action." *Dine CARE*, 747 F. Supp. 2d at 1249 (citing 40 C.F.R. § 1508.27). "Context refers to the scope of the proposed action, including the interests affected." *Id*. (citing 40 C.F.R. § 1508.27(a)). Intensity "refers to the severity of impact," and requires consideration of a number of factors, including: beneficial and adverse impacts; unique characteristics of the geographic area such as proximity to historic or cultural resources and ecologically critical areas; the degree to which effects are likely to be controversial, highly uncertain, or involve unique or unknown risks; the precedential nature of the action; whether the action is related to other actions with cumulatively significant impacts; and the degree of adverse effects on species listed as endangered or threatened under the Endangered Species Act. 40 C.F.R. § 1508.27(b). Importantly, the presence of any single significance factor can be sufficient to require the preparation of an EIS, and consideration of several significance factors cumulatively can also require preparation of an EIS. *Cascadia Wildlands v. Forest Service*, 937 F. Supp. 2d 1271, 1283-84 (D. Or. 2013) ("[W]hen considered individually, none of these significance factors might require an EIS. However, when considered collectively, they do.").

Here, the Forest Service determined that the Project "w[ould] not have a significant effect on the human environment," AR T10722, despite the presence of several significance factors indicating possible significant environmental consequences

of the Project. These deficiencies–both individually and in combination–indicate that an EIS is required before the Forest Service may implement the Project, and renders the DN/FONSI arbitrary and capricious. 5 U.S.C. § 706(2)(A).

      a.    <u>The Project contemplates significant direct and cumulative impacts.</u>

The Project may have significant direct and cumulative impacts. NEPA's implementing regulations explain that significant impacts "may be both beneficial and adverse" and that a "significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1). The regulations further explain that significant cumulative impacts exist "if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. § 1508.27(b)(7).

Here, the Project would have significant direct and cumulative impacts. First, the Project would impact up to 16,450 acres of National Forest land, including clear cutting 2,370 acres of forest and thinning 6,765 acres of forest. AR T10713. Additionally, approximately 21 miles of temporary roads will be built. AR T10579; AR T06582. The sheer size of the Project in and of itself presents significant impacts. Further, logging trees from approximately 9,000 acres of National Forest land, including clear cutting 2,370 of those acres, without disclosing to the public where specifically those trees will be logged, is significant.

Second, as discussed *supra*, the Project will have significant direct and cumulative impacts to lynx and lynx habitat. "[V]egetation management from this project

and the associated activities (temporary roads) would potentially degrade lynx habitat quality in the short term…." AR T10582; *see also* AR T06503 (estimating that "increased horizontal cover" would not appear on the landscape for "50+ yrs"). The Project will also remove or degrade lynx denning habitat for over 150 years. AR T10577. The loss of lynx denning habitat across an unspecified number of acres throughout the Project area is significant, especially when those effects would be felt for more than 150 years. Further, the Project will impact lynx winter habitat, AR T010264, and an important lynx linkage area, AR T06486. The direct and cumulative effects of the Project are significant individually and significant cumulatively, and indicate there may be significant effects to the environment requiring an EIS. 40 C.F.R. § 1508.27(b)(1); 40 C.F.R. § 1508.27(b)(7).

    b.    The project would be implemented in areas with unique characteristics.

    The Project would be implemented in and near areas with "unique characteristics," including in and near areas with proximity to historic resources and "ecologically critical areas." 40 C.F.R. § 1508.27(b)(3). Indeed, the Project would be implemented in habitat for a variety of species, including the federally listed lynx, the Colorado-listed wolverine, and Rocky Mountain elk. AR T10567; AR T10571. This habitat constitutes "ecologically critical areas." The lynx habitat within the Project area includes very important components of lynx habitat, including lynx denning habitat, lynx winter habitat, and the Tennessee Pass lynx linkage area. AR T10748; AR T10752; AR T10264; AR T06548. All of these lynx habitat types would be impacted by the Project; some of would be degraded or removed for decades. *Id*.

Additionally, the Project would be implemented immediately adjacent to two federally-designated wilderness areas, as well as in close proximity to the Continental Divide National Scenic Trail, the Colorado Trail, and Colorado Roadless Areas. AR T10514; AR T10560-61. All of these ecologically critical areas would be impacted by the Project. Finally, six historic 10th Mountain Division huts would be impacted by the implementation of the Project. AR T02366-68.

Because the Project presents a variety of significant impacts to historic resources and ecologically critical areas, an EIS must be prepared. 40 C.F.R. § 1508.27(b)(1); 40 C.F.R. § 1508.27(b)(3).

    c.    <u>The Projects' effects are highly uncertain and highly controversial.</u>

NEPA requires that an EIS be prepared when the effects of federal action are "highly controversial," 40 C.F.R. § 1508.27(b)(4), or "highly uncertain or involve unique or unknown risks," 40 C.F.R. § 1508.27(b)(5). Here, the EA and DN/FONSI present highly controversial and highly uncertain effects that involve unique or unknown risks.

A federal project is "highly controversial" if there is "a substantial dispute as to the size, nature, or effect of the action." *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002). "An EIS is warranted 'where uncertainty may be resolved by further collection of data,' especially where such data may reduce the need for speculation." *Town of Superior v. U.S. Fish and Wildlife Serv.*, 913 F. Supp. 2d 1087, 1120 (D. Colo. 2012) (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005)).

Here, there is no dispute that there is a dispute "as to the size, nature, or effect of

the action" because the Forest Service does not know specifically where it will implement the project, or its ultimate size of the project after it is fully implemented.[5] This is because, as discussed *supra*, the Forest Service has not identified the specific locations or sizes of logging units.

There is controversy and uncertainty as to the effects of the project on lynx, because the Forest Service does not know, or was unwilling to inform the public of, the current condition of certain types of lynx habitat–including lynx denning habitat and lynx winter habitat–and the anticipated future condition of those same habitat types. Indeed, as contemplated by *Town of Superior*, much of this uncertainty could be resolved through the preparation of an EIS that analyzed what types of habitat exists on the Forest, where logging units will be geographically located and what their sizes will be, and the resulting impacts on lynx habitat in the project area.

The DN/FONSI states that the "decision has no known effects on the human environment that are highly uncertain," AR T10724, but this is refuted by the EA, which admits that the Forest Service is uncertain as to where specifically the project will be implemented within the project area.  Absent site-specific information about where the project will be implemented, what lynx habitat types exists in those locations, and the size of such logging prescriptions, there can be no other conclusion but that the Project would have highly uncertain effects. The EA and DN/FONSI contemplate highly

---

[5] Although the Forest Service outlines the intended acres to be logged by the Project, *see* AR T10713, because it is not disclosed how much habitat will not qualify to be logged–such as habitat with greater than 35% dense horizontal cover or areas designated as reserves–the exact size of the project after it is fully implemented is also not disclosed. There could not be a better example of a project that has "highly uncertain" effects.

controversial and highly uncertain effects and therefore an EIS is required. 40 C.F.R. §

1508.27(b)(1); 40 C.F.R. § 1508.27(b)(4); 40 C.F.R. § 1508.27(b)(5).

        d.    <u>The project contemplates significant effects to species listed as threatened</u>
<u>under the Endangered Species Act.</u>

The Forest Service must assess the significance of the "degree to which the

action may adversely affect an endangered or threatened species." 40 C.F.R. §

1508.27(b)(9). Here, as discussed *supra*, the Project would have significant impacts on

lynx and lynx habitat. Although the Forest Service determined that the project may

affect, but was not likely to adversely affect lynx, AR T06504, this does not mean that

there will be no effects. The presence of any effects to a species listed as threatened

under the ESA, such as lynx, raises the significance of the project by some degree.

When considered with the other significance factors, an EIS is clearly required.

**III.    The Forest Service failed to consider a reasonable range of alternatives.**

The alternatives analysis is the "heart" of any NEPA document. 40 C.F.R. §

1502.14; *Dine CARE*, 747 F. Supp. 2d at 1254 ("The obligation to consider alternatives

to the proposed action is at the heart of the NEPA process, and is 'operative even if the

agency finds no significant environmental impact.'") (quoting *Greater Yellowstone Coal.*

*v. Flowers*, 359 F.3d 1257, 1277 (10th Cir. 2004)). Federal agencies are required to

"[r]igorously explore and objectively evaluate all reasonable alternatives, and for

alternatives … eliminated from detailed study, briefly discuss the reasons for their

having been eliminated." 40 C.F.R. § 1502.14(a). "Although 'an agency's obligation to

consider alternatives under an EA is a lesser one than under an EIS … NEPA requires

that alternatives be given full and meaningful consideration' whether the agency

prepares an EA or an EIS." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008) (internal citations omitted).

The discussion of alternatives is intended to provide a "clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. In the alternatives analysis itself, the Forest Service must "[d]evote substantial treatment to each alternative considered in detail … so that reviewers may evaluate their comparative merits." 40 C.F.R. § 1502.14(b). "In formulating an EA, an agency must 'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.'" *Dine CARE*, 747 F. Supp. 2d at 1254-55 (quoting 42 U.S.C. § 4332(2)(E); citing 40 C.F.R. § 1508.9(b)). "A party reviewing an EA should not be forced to read between the lines to determine whether the agency has considered a reasonable alternative. *Id*. at 1256. "Once the decision has been made without meaningful consideration of a reasonable alternative, the harm envisioned by NEPA has been done…The existence of a viable but unexamined alternative renders an alternatives analysis, and the EA which relies upon it, inadequate." *Id*.

In determining what constitutes a reasonable range of alternatives, NEPA requires that agencies "take into proper account all possible approaches to a particular project … which would alter the environmental impact and the cost-benefits balance." *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995) (internal citation omitted). Reasonable alternatives include all viable alternatives. *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013); *see also* Forty

Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18027 (March 23, 1981) (NEPA document must "examine all reasonable alternatives … [T]he emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative."). "Feasible alternatives should be considered in detail." *W. Watersheds Project*, 719 F.3d at 1052. An agency's failure to consider a reasonable alternative "renders an [EA] inadequate." *Id*. at 1050 (internal citation omitted); *see also Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813-14 (9th Cir. 1999) (same).

Here, the EA includes only two action alternatives, which means that "[t]he proposed action, Alternative 1, contains the greatest amount of acres to be treated, however Alternative 2 contains a larger number of acres that would be clearcut. The Forest Service appears to be presenting the public with two options and challenging them to pick their poison." AR T10748. As a result, Guardians suggested numerous reasonable alternatives for the Forest Service to consider: an alternative excluding all mapped lynx habitat from treatment; an alternative that used only existing roads or constructed fewer miles of temporary roads; and an alternative that would have left additional woody debris on the landscape so as to not degrade lynx denning habitat for 150 years. AR T10748; AR T10752. The Forest Service, however, failed to consider any of these reasonable alternatives in detail while, at the same time, it did not explicitly reject them as unreasonable or impractical, or discuss them in any other way. The Forest Service's own NEPA regulations state that the Forest Service must consider

other reasonable alternatives when "there are … unresolved conflicts concerning alternative uses of available resources." 36 C.F.R. § 220.7(b)(2)(i).

Here, there clearly are unresolved conflicts concerning alternative uses of available resources: clear cutting the Project area vs. preserving important lynx habitat; clear cutting the project area vs. non-motorized, quiet recreation on the Forest. Additional alternatives should have been considered and analyzed in the EA, including a true conservation-based alternative. *Dine CARE*, 747 F. Supp. 2d at 1254-55. At a bare minimum, the Forest Service should have explained why it decided to not consider *any* of the potential alternatives proposed by Guardians. 40 C.F.R. § 1502.14(a). Because the Forest Service made its decision "without meaningful consideration of a reasonable alternative, the harm envisioned by NEPA has been done," and the EA is therefore "inadequate." *Dine CARE*, 747 F. Supp. 2d at 1256.

## CONCLUSION

For the foregoing reasons, the Court should grant Guardians' Petition for Review, issue declaratory relief outlining the Forest Service's violations of law, and vacate the Tennessee Creek project EA and DN/FONSI. 5 U.S.C. § 706(2)(A).

Respectfully submitted and dated this 25th day of November, 2015.

/s/ John R. Mellgren
John R. Mellgren (OSB #114620)
Peter M.K. Frost (OSB #911843)
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Ph. (541) 359-0990
Fax (541) 485-2457
mellgren@westernlaw.org

frost@westernlaw.org

Attorneys for Plaintiff
WildEarth Guardians
516 Alto Street
Santa Fe, New Mexico 87501

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Colorado by using the Court's CM/ECF system on November 25, 2015. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the District Court's CM/ECF system. The Court's CM/ECF system will send electronic notification of this filling to the following individuals:

Stuart C. Gillespie – stuart.gillespie@usdoj.gov

Jacob Licht-Steenfat – Jacob.licht-steenfat@usdoj.gov

Peter Martin Koerber Frost – frost@westernlaw.org

John R. Mellgren – mellgren@westernlaw.org

/s/ John R. Mellgren
John R. Mellgren (OSB #114620)
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Ph. (541) 359-0990
Fax (541) 485-2457
mellgren@westernlaw.org